## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) |
| MES INTERNATIONAL, INC.,[1] | ) Chapter 11 |
| | ) |
| Debtor. | ) Case No. 09-14109 |
| | ) |
| | ) |
| In re: | ) |
| | ) Chapter 11 |
| GSI GROUP INC., | ) |
| | ) Case No. 09-14110 |
| Debtor. | ) |
| | ) |
| In re: | ) |
| | ) Chapter 11 |
| GSI GROUP CORPORATION, | ) |
| | ) Case No. 09-14111 |
| Debtor. | ) |
| | ) Joint Administration Requested |

## DECLARATION OF SERGIO EDELSTEIN, Ph.D., IN
## PART II: FIRST DAY PLEADINGS

I, Sergio Edelstein, Ph.D., hereby state that the following is true to the best of my knowledge, information, and belief.

1.      I am the President and Chief Executive Officer of MES International, Inc., GSI Group Inc. and GSI Group Corporation (collectively, the "Debtors") and have held such position at GSI Group Inc. since July 2006.

2.      I am generally familiar with the Debtors' day-to-day operations, business affairs and books and records.  Except as otherwise indicated, all facts set forth in this Declaration are offered to the best of my knowledge, information and belief, and are based upon

---

[1]      The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: MES International, Inc. (1964); GSI Group Inc. (0412); and GSI Group Corporation (9358).  The Debtors' headquarters is located at 125 Middlesex Turnpike, Bedford, MA 01730.

my personal knowledge, my review of relevant documents, information provided to me by the Debtors' management or professionals working with me or under my supervision, or my informed opinion based upon my experience and knowledge of the Debtors' industry, operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Declaration on behalf of the Debtors.

3.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief with the Court under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.*, as amended (the "Bankruptcy Code"). To enable the Debtors to operate effectively and preserve the value of estate assets, the Debtors have requested various types of relief in "first-day" applications and motions filed with this Court contemporaneously herewith (the "First Day Pleadings").

4.      I submit this Declaration in support of the First Day Pleadings. Any capitalized term not defined herein shall have the meaning ascribed to such term in the relevant First Day Pleadings. The First Day Pleadings seek, among other things, to: (a) ensure the continuation of the Debtors' cash management systems and other business operations without interruption; (b) maintain customers' confidence; (c) maintain employee morale and confidence; and (d) establish certain other administrative procedures to promote a smooth transition into Chapter 11. Gaining and maintaining the support of the Debtors' employees, customers, vendors, and other key constituencies, as well as maintaining the day-to-day operations of the Debtors' business with minimal disruption, will be critical to the Debtors' reorganization.

5.      Part I of this Declaration describes the Debtors' business and the circumstances surrounding the filing of the chapter 11 petitions. Part II sets forth the relevant facts in support of the First Day Pleadings. Part III concludes that the relief requested in the First

Day Pleadings is in the best interests of the Debtors, their creditors and estates and therefore should be granted.

## PART I: BACKGROUND

**A.    General Background**

6.    The Debtors in these cases are comprised of three entities within a corporate family led by parent company GSI Group Inc. ("Holdings").  The Debtors are Holdings, its wholly owned subsidiary GSI Group Corporation ("GSI"), and MES International, Inc. ("MES"), a wholly owned subsidiary of MicroE Systems, Inc., which is an indirect wholly owned subsidiary of GSI.  Holdings has ten other U.S. and nineteen foreign subsidiaries and one joint venture (such subsidiaries, together with Holdings, GSI and MES, collectively, the "Company"), which have not filed for chapter 11 protection and are not Debtors in these chapter 11 cases (the "Chapter 11 Cases").

7.    Holdings was founded in 1968 as General Scanning, Inc. ("General Scanning"), and incorporated in Massachusetts.  In 1999, General Scanning merged with Lumonics Inc., a Canadian company that developed, manufactured and sold laser-based, advanced manufacturing systems for electronics, semiconductor, and general industrial applications.  GSI Lumonics Inc., the post-merger entity, incorporated under the laws of New Brunswick, Canada.  In 2005, GSI Lumonics Inc. renamed itself GSI Group Inc.

8.    In August 2008, the Company acquired Excel Technology, Inc. ("Excel"), a designer, manufacturer and marketer of photonics-based solutions.  Prior to the acquisition, Excel, which is not a Debtor in the Chapter 11 Cases, was headquartered in East Setauket, New York.  Excel manufactures its products in plants located in the United States and Germany, and

sells its products to customers worldwide, both directly and indirectly through resellers and distributors.

**B.    The Debtors' Business**

9.    The Company designs, develops, manufactures and sells photonics-based solutions (consisting of lasers, laser systems and electro-optical components), precision motion devices, associated precision motion control technology and systems. The Company's customers incorporate its technology into their products or manufacturing processes, for a wide range of applications across multiple markets, including: industrial, scientific, electronics, semiconductor, medical and aerospace. The Company's products enable customers to implement advanced manufacturing process, to make advances in materials and processing technology, and to meet extremely precise manufacturing specifications, including device complexity and miniaturization. The Company has two core business segments:

(a)    Precision Technology Segment. The Company's Precision Technology Segment primarily sells components to original equipment manufacturers ("OEMs"), who then integrate its products into application specific products or systems. The Company's OEM products include those based on its core competencies in laser, precision motion and motion control technology. The Precision Technology Segment, which includes the operations of Excel, has seven major product lines, including lasers and laser-based systems, scanners, optics, printed circuit board spindles, encoders, thermal printers and light and color measurement.

(b)    Semiconductor Systems Segment. The Company's Semiconductor Systems Segment designs, develops and sells production systems that process semiconductor wafers using laser beams and high precision motion technology. The Company sells manufacturing systems to integrated device manufacturers and wafer processors. The Company's systems perform laser based processing on all of the following types of semiconductors: general wafers used for logic or memory purposes, dynamic random access memory chips and high performance analog chips. The Semiconductor Systems Segment has three major product lines (wafer repair, wafer trim and wafer mark) and two smaller product lines (CircuitTrim and SVS).

10.    The Company, headquartered in Bedford, Massachusetts, sells worldwide

with a direct sales force and through distributors and sales agents. The Company manufactures Precision Technology products at facilities in Bedford and Lexington, Massachusetts; Chatsworth, Oxnard and Santa Clara, California; East Setauket, New York; Orlando, Florida; Mukilteo, Washington; Poole, Rugby and Taunton, United Kingdom; Ludwigsburg, Germany; and Suzhou, China. Semiconductor Systems are manufactured, assembled and tested in Bedford, Massachusetts. Additional research and development, sales, service and logistics sites are located in California, Colorado, the United Kingdom, Germany, France, Italy, Japan, Korea, Taiwan, China, Malaysia and Sri Lanka. The Company employs approximately 1,300 full and part-time employees.

**B.      Prepetition Financing**

11.      The Debtors have no material secured debt. In August 2008, in order to finance a portion of the Excel acquisition, GSI issued and sold to various investors $210.0 million of unsecured senior notes with a fixed interest rate of 11% per annum due 2013 (the "Senior Notes"), which are guaranteed by Holdings and certain of Holdings' U.S. subsidiaries.

**C.      Events Leading to the Commencement of the Chapter 11 Cases**

*Revenue Recognition Issues*

12.      Delays in the integration of the financial accounting systems of Holdings and Excel immediately following the acquisition of Excel in 2008 initially led to a delay of several weeks in the preparation of Holdings' Quarterly Report on Form 10-Q for the quarterly period ended September 26, 2008 (the "2008 Q3 Report"). Shortly thereafter and prior to filing the 2008 Q3 Report, on December 4, 2008, Holdings announced that it had identified potential errors in the recognition of revenue related to sales to a customer in the first and second fiscal quarters of 2008 in Holdings' Semiconductor Systems Segment, which were brought to the

attention of the Audit Committee of Holdings' Board of Directors (the "Audit Committee") by Holdings' management. Following an initial review, the Audit Committee, in consultation with Holdings' outside legal counsel and its independent auditors, Ernst & Young, determined that it was appropriate to undertake an independent review of the potential revenue recognition issues brought to its attention. In connection therewith, the Audit Committee subsequently voluntarily expanded its review of sales transactions in the Company's Semiconductor Systems Segment, along with other sales transactions that contained arrangements with multiple deliverables for fiscal years 2006, 2007 and 2008.

13.     Between December 4, 2008 and March 30, 2009, Holdings announced that it had identified errors relating to the timing of revenue recognition relating to certain sales to customers in the Semiconductor Systems Segment during fiscal years 2006, 2007 and 2008 and that, as a result, the previously issued interim and annual financial statements for these years should not be relied upon. Holdings voluntarily reported the results of its review to the U.S. Securities and Exchange Commission (the "SEC") on April 30, 2009. On June 30, 2009, Holdings announced it was undertaking a review of the timing of revenue recognized in connection with multiple element arrangements in its Precision Technology Segment from 2004 through 2008 to determine if adjustments were necessary for those periods. On August 31, 2009, Holdings announced approximate ranges of restated revenues in its Precision Technology Segment during fiscal years 2004 through 2008. As of November 18, 2009, Holdings has completed its determination of the revenue adjustments in both its Semiconductor Systems and Precision Technology Segments, and is in the process of finalizing its restated financial reports, which Holdings currently expects to file promptly.

14.    As a result of Holdings' failure to file the 2008 Q3 Report, Holdings received a Delinquency Compliance Audit Letter from the NASDAQ Stock Market ("NASDAQ"), indicating that Holdings was not in compliance with a certain NASDAQ listing rule (the "Rule"). Based on a compliance plan and subsequent updates thereto (the "Compliance Plan") filed by Holdings, NASDAQ granted Holding an extension until May 4, 2009 to file its 2008 Q3 Report with the SEC and regain compliance with the Rule. Due to the ongoing Audit Committee review, Holdings was unable to file its 2008 Q3 Report by the extended deadline and, on May 6, 2009, it received a Staff Determination Notice from NASDAQ, stating that the Holdings' stock was subject to delisting. A hearing before the NASDAQ Listing Qualifications Panel (the "Panel") was held on June 11, 2009. Holdings informed the Panel that the investigation of its revenue recognition of sales transactions in the Semiconductor Systems Segment was completed in May 2009 and that Holdings expected to complete its revenue restatement and regain compliance with the Rule by no later than October 31, 2009. Holdings also informed the Panel that it expected to complete its review of revenue transactions in the Semiconductor Systems Segment for fiscal years 2004 through 2008, and in the Precision Technology Segment, within the timeframe set forth in the Compliance Plan.

15.    On July 22, 2009, Holdings announced that the Panel granted its request for continued listing on NASDAQ. The Panel's determination was conditioned on Holdings (i) reporting to the Panel by August 31, 2009 the status of its public disclosure about the range of adjustments Holdings expects to make to revenue transactions in its Precision Technology Segment for 2004 through 2008; and (ii) filing by November 2, 2009 its delayed periodic reports and any required restatements. On August 31, 2009, Holdings issued a press release announcing

approximate ranges of restated revenues in its Precision Technology Segment during fiscal years 2004 through 2008. While Holdings continues to work diligently to complete the preparation and filing of its delayed periodic reports, in addition to its restated financial statements for fiscal years 2006, 2007 and 2008, Holdings was not able to meet the November 2, 2009 deadline. Accordingly, on November 3, 2009, Holdings received notification from the Panel that the Panel determined to delist Holdings' shares from NASDAQ and suspended trading in Holdings' shares effective at the open of business on November 5, 2009. As provided under applicable NASDAQ rules, Holdings timely requested a review of the Panel's delisting determination by the NASDAQ Listing and Hearing Review Council (the "Listing Council"). In addition, in accordance with NASDAQ rules, both the Listing Council and the Board of Directors of The NASDAQ Stock Market LLC (the "NASDAQ Board") may call the Panel's decision for review.

*Discussions with Noteholders*

16.     In December of 2008, certain holders of the Senior Notes alleged that Holdings had failed to comply with the covenant in Section 4.02 of the indenture for the Senior Notes (the "Indenture") as a result of Holdings' failure to timely file its 2008 Q3 Report with the SEC. These holders further alleged that, if such failure continued for 60 days from the date that Holdings received notices of failure from Holders comprising at least 25% of the aggregate amount of Senior Notes then outstanding, then such failure would constitute an event of default.

17.     As a result of these events, Holdings began engaging in ongoing discussions with certain holders of the Senior Notes. On February 11, 2009, Holdings announced that it entered into a forbearance agreement with certain entities holding greater than 75% of the outstanding aggregate principal amount of the Senior Notes (the "Senior Noteholders"). Thereafter, the Company continued to engage in negotiations regarding

restructuring of the Company's debt. The negotiations ultimately led in June 2009 to an agreement on a non-binding term sheet with the Senior Noteholders to consensually restructure the Company's outstanding obligations under the Senior Notes. Since that time, Holdings has conducted an extensive process to identify possible alternatives to the transactions described in the Plan (as hereinafter defined), and has concluded that the transactions described in the Plan provide the highest and best treatment for all creditors of the Debtors' estates, Holdings' shareholders and the Company's customers, vendors and employees.

18.     On November 19, 2009, the Debtors and the Senior Noteholders entered into a Plan Support Agreement. Pursuant to the Plan Support Agreement, holders of 88.1% of the outstanding principal amount of the Senior Notes have agreed to support the Joint Chapter 11 Plan of Reorganization for MES International, Inc., GSI Group Inc. and GSI Group Corporation (the "Plan"), which was filed in the Chapter 11 Cases on the Petition Date, to the extent the Debtors continue to comply with the terms and conditions of the Plan Support Agreement. Pursuant to the Plan, the Senior Notes, together with an additional unsecured note payable by GSI to a foreign subsidiary of Holdings (the "GSI UK Note"), will be converted to (a) a payment in cash for accrued and unpaid prepetition interest (at the non-default rate), and certain fees, expenses and certain other amounts (other than principal) due to the extent such amounts are unpaid as of the Effective Date; (b) new common shares equal to 81.4% of the outstanding capital stock of reorganized Holdings[2]; and (c) new secured notes in the approximate amount of $104,100,000[3], resulting in the reduction of the Debtors' funded indebtedness by more than

---

[2]     Specifically, the holders of Senior Notes will receive approximately 74.3% of the outstanding capital stock of reorganized Holdings, and the holder of the GSI UK Note will receive approximately 7.1% of the outstanding capital stock of reorganized Holdings.

[3]     Specifically, holders of the Senior Notes will receive new secured notes in the approximate aggregate amount of $95 million, and the holder of the GSI UK Note will receive new secured notes in the approximate aggregate amount of $9.1 million.

$125,000,000 and leaving the Debtors' remaining debt, including all vendor payables and all or substantially all other claims, unimpaired under the Plan. The Debtors filed the Chapter 11 Cases to implement the Plan.

*Debtors' Ability to Meet their Obligations Arising Prior to and Following the Filing of the Plan*

19.    The Debtors have met their obligations as they have come due. These obligations have included approximately $23 million of annual interest payments on the Senior Notes, approximately $17 million of non-recurring professional and other costs during the past 12 months related to the review of revenue transactions in both their Semiconductor Systems and Precision Technology business segments, approximately $5 million of non-recurring professional and other costs related to the debt restructuring, and $2 million for severance costs. The Debtors have had sufficient cash from operations to meet their obligations arising prior to their filing of the Plan and believe that they will continue to have sufficient cash to readily pay when due all ordinary course obligations arising after the commencement of these cases.

20.    The Debtors are making every effort to commence and implement these cases with as little disruption as possible to their highly valued customers, employees and vendors. The Debtors have operations and subsidiaries around the World, and the continuity of payments and the honor of ordinary course employment benefit, product warranty, customer service and cash management systems and practices, especially in areas not well versed in U.S. bankruptcy law, is critical to the preservation of the Debtors' enterprise value and the mitigation of reputational and competitive risk. The Debtors respectfully submit that relief in those respects on short notice is especially appropriate where, as here, the only impaired creditors are those who actively support confirmation of a pre-negotiated plan of reorganization filed on the Petition

Date. As set forth in detail below, the Debtors seek immediate entry of orders to effectuate this goal.

**PART II: FIRST DAY PLEADINGS**

21. An important (and in many respects critical) element of the success of these chapter 11 cases will be the entry of orders granting the relief requested in each of the First Day Pleadings. Generally, the First Day Pleadings are designed to facilitate: (a) the continuation of the Debtors' existing cash management systems and other business operations without interruption; (b) preservation of customer and vendor relationships; (c) maintenance of employee morale and confidence; and (d) establishment of certain other administrative procedures to promote a smooth transition into chapter 11. The factual background in support of each First Day Pleading is provided below:

A.      **Motion of the Debtors for Order Authorizing Joint Administration of Their Chapter 11 Cases Pursuant to Fed. R. Bankr. P. 1015(b) and Local Rule 1015-1 (the "Joint Administration Motion")**

22. In the Joint Administration Motion, the Debtors seek the joint administration of their chapter 11 cases for procedural purposes only. The Debtors are affiliates as defined in Section 101(2) of the Bankruptcy Code. Joint administration of their cases will promote the economical, efficient, and convenient administration of the Debtors' estates.

23. The Debtors' operations are closely integrated and there will be numerous motions, applications, and other pleadings filed in these chapter 11 cases that will affect all of the Debtors. Joint administration will allow for the efficient administration of the Debtors' three (3) chapter 11 cases.

24. Joint administration of the Debtors' chapter 11 cases will permit the Clerk of the Court to use a single general docket for each of the Debtors' cases and for the proposed

claims agent to combine notices to creditors and other parties-in-interest of the Debtors' respective estates.

25.     Allowing joint administration will significantly reduce the volume of pleadings that otherwise would be filed with the Clerk of this Court, render the completion of various administrative tasks less costly and minimize the number of unnecessary delays. Moreover, the relief requested by this Motion will simplify supervision of the administrative aspects of these cases by the Office of the United States Trustee.

26.     The proposed joint administration order also will save time and money and avoid duplicative and potentially confusing filings by permitting counsel for all parties-in-interest to:  (a) use a single caption on the numerous documents that will be served and filed herein; and (b) file the papers in one case rather than in multiple cases.  Finally, joint administration will protect parties-in-interest by ensuring that parties in each of the Debtors' respective chapter 11 cases will be apprised of the various matters before the Court in these cases.

27.     I have read the Joint Administration Motion and believe that the relief requested in the Motion is in the best interests of the Debtors and the Debtors' estate.

**B.      Motion of the Debtors for an Order Authorizing the Debtors to: (I) File a Consolidated List of Creditors, (II) File a Consolidated List of Debtors' Thirty Creditors Holding Largest Unsecured Claims; and (III) Mail Initial Notices (the "<u>Creditor List Motion</u>")**

28.     In the Creditor List Motion, the Debtors seek permission to file (i) a consolidated list of creditors and (ii) a consolidated list of the Debtors' thirty (30) largest creditors.  The Debtors also seek permission to complete all mailings of notices, including notices of the commencement of these cases and of the meeting of creditors.

29.     The Debtors have identified over 1,200 entities to which notice of certain

proceedings in these chapter 11 cases must be provided. The Debtors presently maintain various computerized lists of the names and addresses of their respective creditors that are entitled to receive notices and other documents in these cases. The information, as maintained in the Debtors' computer files (or those of the Debtors' agents), may be consolidated and utilized efficiently to provide parties with notices and other similar documents in accordance with the Bankruptcy Rules.

30. A single consolidated list of the Debtors' thirty (30) largest unsecured creditors would be more reflective of the body of unsecured creditors that have the greatest stake in these cases.

31. For the foregoing reasons, the relief requested in the Creditor List Motion should be granted.

C. **Motion of Debtors for an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals and Committee Members (the "Interim Compensation Motion")**

32. The Debtors have filed applications seeking approval of the employment of Brown Rudnick LLP and Saul Ewing LLP as their general and local bankruptcy counsel. In addition, the Debtors likely will seek to retain other professionals to assist with the restructuring of their business. An Official Committee of Unsecured Creditors and other committees may also be appointed in these cases. If appointed, the Committee(s) are likely to retain counsel and other professionals.

33. Given the complex nature of these cases, the Debtors request that procedures (as further set forth in the Interim Compensation Motion and incorporated by reference herein) be established for compensating and reimbursing the Professionals on a monthly basis that are comparable to the procedures established in other large chapter 11 cases in

this District and elsewhere. Such procedures will streamline the professional compensation process and enable the Court and other parties to more effectively monitor the professional fees incurred in these chapter 11 cases. Accordingly, the Interim Compensation Motion should be granted.

**D.**     **Application for Order Authorizing the Retention and Employment of Brown Rudnick LLP as Bankruptcy Counsel, *Nunc Pro Tunc* as of the Petition Date, Pursuant to Bankruptcy Code Sections 327(a) and 1107(a), Fed. R. Bankr. P. 2014(a) and 2016(b), and Local Bankruptcy Rule 2014-1 (the "<u>Brown Rudnick Retention Application</u>")**

34.     The Debtors seek the entry of an order authorizing the employment and retention of Brown Rudnick LLP ("<u>Brown Rudnick</u>") as the Debtors' lead bankruptcy counsel in this matter.

35.     The Debtors selected Brown Rudnick based on the firm's long-standing relationship and prior familiarity with the Debtors and their legal needs, and because the firm and its attorneys have extensive experience, knowledge, and resources in the area of debtors' and creditors' rights, and, in addition to a national bankruptcy practice, have extensive experience with the bankruptcy courts in various jurisdictions. Brown Rudnick also has the ability to commit substantial resources to legal problems on an urgent basis. Under the circumstances, the Debtors have concluded that Brown Rudnick is particularly well qualified to represent the Debtors in these chapter 11 cases.

36.     By assisting the Debtors with preparations for the filing of these chapter 11 cases and as a result of Brown Rudnick's long-term, pre-petition representation of the Debtors, Brown Rudnick's attorneys have become familiar with the complex factual and legal issues that will have to be addressed in these chapter 11 cases in order to preserve the possibility of a reorganization for the Debtors and to maximize the value of the assets of the Debtors'

estates.

37.    I believe that the retention of Brown Rudnick, with its knowledge of and experience with the Debtors and the industry in which they operate, will assist in the efficient administration of the estates, and is therefore in the best interests of the Debtors and their estates.

**E.**    **Application of Debtors for an Order Authorizing the Retention and Employment of Saul Ewing LLP as Co-Counsel to the Debtors Pursuant to 11 U.S.C. § 327(a)** *Nunc Pro Tunc* **to the Petition Date (the "Saul Ewing Retention Application")**

38.    The Debtors also desire to employ the law firm of Saul Ewing LLP ("Saul Ewing") to serve as co-counsel and conflicts counsel with Brown Rudnick for all matters related to these chapter 11 cases.

39.    The Debtors seek to retain Saul Ewing because of its extensive expertise and knowledge in the field of business reorganizations under chapter 11 of the Bankruptcy Code, and its practical experience in practicing before the United States Bankruptcy Court for the District of Delaware.

40.    Retention of Saul Ewing will also permit the Debtors to benefit from Saul Ewing's close proximity to this Court, and its ability to respond quickly to emergency hearings and other emergency matters in this Court.

41.    The Debtors have directed Saul Ewing and Brown Rudnick to coordinate their efforts in order to ensure that they complement, and do not duplicate, one another, thereby minimizing the overall expense to the Debtors' estates.

42.    Consistent with that directive, the Debtors anticipate that Brown Rudnick will serve as lead counsel to the Debtors, with Saul Ewing acting as the Debtors' local Delaware counsel and serving as lead counsel only with respect to those matters, if any, that may arise with respect to which Brown Rudnick may have a conflict of interest.

43. I believe that the retention of Saul Ewing, with its extensive expertise and knowledge of bankruptcy and its practical experience in practicing in this District, will assist in the efficient administration of the estates and is therefore in the best interests of the Debtors and their estates.

**F. Application of the Debtors for an Order Authorizing the Retention and Employment of Wilson Sonsini Goodrich & Rosati as Special Counsel to the Debtors Pursuant to 11 U.S.C. § 327(e) *Nunc Pro Tunc* to the Petition Date**

44. The Debtors request entry of an order authorizing the employment and retention of Wilson Sonsini Goodrich & Rosati ("Wilson Sonsini") as special counsel for the Debtors, *nunc pro tunc* to the Petition Date.

45. The Debtors seek to retain Wilson Sonsini as their special counsel because of the firm's extensive experience and knowledge in the field of corporate and securities law. The proposed scope of Wilson Sonsini's retention will include assisting the company with corporate, financing, mergers & acquisitions, technology licensing and employee benefit matters.

46. The Debtors have directed Saul Ewing, Brown Rudnick and Wilson Sonsini to coordinate their efforts in order to ensure that they complement, and do not duplicate, one another, thereby minimizing the overall expense to the Debtors' estates.

47. I believe that the retention of Wilson Sonsini, with its extensive expertise and knowledge of securities law, will assist in the efficient administration of the estates and is therefore in the best interests of the Debtors and their estates.

**G. Application of Debtors for an Order Under 11 U.S.C. §§ 327(a), 328(a), and 1107(b) and Fed. R. Bankr. P. 2014(a) and 2016 Authorizing Employment and Retention of CRG Partners Group LLC, As Financial Advisors to Debtors, *Nunc Pro Tunc* to the Petition Date**

48. The Debtors seek entry of an order authorizing the retention and employment of CRG Partners Group LLC ("CRG"), as financial advisors to the Debtors, *nunc*

*pro tunc* to the Petition Date.

49. The Debtors seek to retain CRG to, among other things, assist with cash flow forecasting, cash flow management and to otherwise provide financial advice to the Debtors, including but not limited to advice with respect to the Plan. CRG specializes in the provision of turnaround, crisis management, performance improvement, and restructuring services for public and private companies, general creditors, secured parties, acquirers of non-performing companies, and judicial bodies. The Debtors selected CRG because of CRG's extensive experience in providing financial advisory services in restructurings and reorganizations.

50. I believe that the services of CRG will be critical to the Debtors' efforts to maximize the value of their estates and reorganize successfully.

**H.** **Application for an Order Authorizing the Debtors to Retain and Employ the Garden City Group, Inc. as Claims, Noticing, and Balloting Agent Pursuant to 28 U.S.C. §156(c), Rule 2002(f) of the Federal Rules of Bankruptcy Procedure and Local Rule 2002-1(f) as of the Petition Date (the "Garden City Group Retention Application")**

51. The Debtors seek to employ and retain the Garden City Group, Inc. (the "Garden City Group") as the Debtors' Notice and Claims Agent pursuant to Local Bankruptcy Rule 2002-1(f).

52. In that capacity, the Debtors anticipate that the Garden City Group will: (i) give notice of the order for relief, the hearings, and orders filed in the case, the meeting of creditors pursuant to section 341 of the Bankruptcy Code, and the setting of a claims bar date; (ii) provide record keeping and claims docketing and reconciliation; (iii) mail and tabulate ballots for the purposes of voting in chapter 11 cases; and (iv) prepare the Schedules of Assets and Liabilities and the Statements of Financial Affairs. The Debtors have identified

approximately 1,200 potential creditors and believe that the Garden City Group's retention is the most effective and efficient manner of providing notice to the Debtors' creditors and other parties in interest of the commencement of these chapter 11 cases and any other developments that occur in these chapter 11 cases.

53.     The Garden City Group is a well-known and highly experienced notice and claims administration firm that has substantial experience in assisting with the orderly administration of chapter 11 bankruptcy cases.

54.     The Debtors believe that the Garden City Group is well qualified to serve as the Debtors' Notice and Claims Agent in these chapter 11 cases.

55.     I have read the Garden City Group Retention Application and believe that the retention of the Garden City Group is in the best interests of the Debtors and their estates.

I.      **Motion of the Debtors for an Order Authorizing the Retention and Employment of Professionals Used in the Ordinary Course of Business (the "Ordinary Course Professionals Motion")**

56.     Prior to the Petition Date, the Debtors utilized the services of various attorneys, accountants, and other professionals (the "Ordinary Course Professionals") to represent and advise them in matters unrelated to the commencement or administration of these chapter 11 cases.

57.     The Ordinary Course Professionals Motion seeks authorization for the Debtors to continue using the services provided by these Ordinary Course Professionals without the necessity of a separate, formal retention application approved by this Court, and for authority to pay such Ordinary Course Professionals for post-petition services rendered and expenses incurred in the ordinary course of business, subject only to the terms and restrictions set forth in the Ordinary Course Professionals Motion.

58.     The Debtors believe that the continued use of the Ordinary Course

Professionals will provide a material benefit to the estate by avoiding the expense and necessity of having new professionals relearn what the Ordinary Course Professionals already know about the Debtors' affairs and ensuring continuity in the Debtors' representations.

59. I have read the Ordinary Course Professionals Motion and believe that the relief requested by the Ordinary Course Professional Motion is in the best interests of the Debtors and their estates.

**J.** **Motion of the Debtors for an Order Authorizing (I) Payment of Pre-Petition Employee Wages, Salaries, and Other Compensation; (II) Reimbursement of Pre-Petition Employee Business Expenses; (III) Payment of Pre-Petition Tax and Other Withholdings to Third-Parties; (IV) Contributions to Pre-Petition Employee Health and Other Benefit Programs and Continuation of Such Programs; (V) Payment of Workers' Compensation Obligations and Other Insurance Premiums; and (VI) Related Relief (the "Wage Motion")**

60. In the Wage Motion, the Debtors seek the authority, but not the obligation, to pay certain pre-petition claims for (i) employee wages, salaries and other compensation, including independent consulting fees, (ii) reimbursement of certain business and relocation expenses, (iii) federal and state withholding and/or payroll taxes, (iv) contributions to employee benefit plans, and (v) all other employee-related benefits that the Debtors pay in the ordinary course of their business.

61. As of the Petition Date, the Debtors employ approximately 209 individuals, of whom approximately 208 are full-time employees and 1 is a part time Employee (each, an "Employee" and collectively, the "Employees"). Of the total Employees, approximately 187 are based in the United States (the "US Employees"), 8 are based in GSI's Korean branch office (the "Korea Employees"), and 14 are based in GSI's Taiwan branch office (the "Taiwan Employees," and together with the Korean Employees, the "Foreign Employees"). Of the Debtors' Employees, approximately 140 are compensated on the basis of a fixed salary

and 69 are compensated on an hourly basis. In addition, there are approximately 7 temporary employees (the "Temporary Employees") that perform services that are essential to the operation of the Debtors. The Temporary Employees are not Employees of the Debtors but, instead, are employed by a temporary agency and are assigned to the Debtors on a temporary basis. There are also approximately 11 independent contractors and/or independent consultants (the "Independent Consultants") who provide services to the Debtors that are critical to the Debtors' continued operations.

62.     The Employees perform a variety of critical functions for the Debtors' businesses, and the Employees' skills and their specialized knowledge and understanding of the Debtors' infrastructure and operations are essential to the Debtors' continuing operations and their reorganization effort. The continued and uninterrupted service of the Employees is critical to the successful reorganization of the Debtor.

63.     To avoid the personal hardship that the Employees will suffer if pre-petition employee related obligations are not paid when due or as expected, and to maintain morale, the Debtors seek authority to pay Employee's accrued pre-petition wages and other benefits, in their sole discretion, to pay and honor certain pre-petition claims for, among other items, wages, salaries and other compensation, other amounts withheld (e.g., garnishments, employee share of insurance premiums, paid time off, medical benefits, insurance benefits) and all other employee benefits that the Debtors historically paid or honored in the ordinary course of business to Employees and to pay all costs incident to the foregoing. The Debtors also seek authority, in their discretion, to pay reimbursable business expenses of Employees.

**(i)      Unpaid Compensation**

64.     In the ordinary course of business, the Debtors incur payroll obligations to the Employees. Such obligations comprise wages and salaries. The Debtors pay the US

Employees payments for wages and salaries on a bi-weekly basis every other Friday in arrears for work performed during the previous two weeks. The Korea Employees are paid on a monthly basis in arrears for work performed during the previous month, and the Taiwan Employees are paid on a monthly basis, in part in arrears and in part in advance, for work performed.

65.     In addition, in the ordinary course of business, the Debtors incur compensation obligations to the Temporary Employees and to the Independent Consultants. Additionally, approximately 12 Employees are eligible for commissions, also paid in arrears.

66.     Because all of the Employees are generally paid in arrears, as of the Petition Date, the Employees have not been paid all of their prepetition wages and compensation. Additionally, some Employees may be entitled to compensation because (a) discrepancies may exist between the amounts paid and the amounts that should have been paid and (b) some checks issued to Employees prior to the Petition Date may not have been presented for payment or may not have cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date.

67.     The Debtors estimate that as of the Petition Date, approximately $935,200 in accrued pre-petition wages, salaries, Temporary Agency Fees, Independent Consultant Fees, commissions, and other compensation (but excluding vacation pay, reimbursement of expenses, reimbursement of relocation expenses, and bonuses) were earned prior to the Petition Date but were not yet paid, together with associated withholding and payroll taxes (collectively, the "Unpaid Compensation").

**(ii)     Reimbursement of Expenses**

68.     Prior to the Petition Date and in the ordinary course of their business, the

Debtors reimbursed Employees, Temporary Employees and Independent Consultants for certain reasonable and customary expenses incurred on behalf of the Debtors in the scope of their employment (the "Reimbursable Business Expenses"). The Reimbursable Business Expenses include reimbursements for (a) business-related travel, such as hotels, airfare, car rental, meals and related expenses; (b) mileage; (c) telephone expenses; (d) membership dues; (e) attendance at conferences; (f) office supplies; (g) publication expenses; and (h) other business-related expenses that are paid by the Employee. In addition, approximately 12 Employees have active corporate credit cards used for the Reimbursable Business Expenses.

69.     Separately, the Debtors provide reimbursement and allowance of certain expenses for Employees who are relocated to another location within the Company, or Employees who are transferred to a foreign country for a short-term assignment, an extended duration assignment, or a permanent assignment (together, the "Relocation Reimbursement").

70.     Reimbursable Business Expenses and relocation costs are all incurred on the Debtors' behalf and with the understanding that the Employee will be reimbursed in the normal course of business. Accordingly, the Debtors seek authorization, in their sole discretion, to (a) continue paying Reimbursable Business Expenses in accordance with prepetition practices, (b) modify their prepetition policies relating thereto as they deem appropriate, (c) pay all Reimbursable Business Expenses that relate to the prepetition period and are submitted to the Debtors postpetition, (d) reimburse Employees for amounts incurred in the ordinary course of business in connection with relocation; and (e) continue to honor the Relocation Reimbursement policy in the ordinary course of business.

**(iii)     Deductions and Withholdings**

71.     During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, (a) any legally ordered

deductions such as wage garnishments, child support, and tax levies; and (b) other pre-tax and after tax deductions payable pursuant to certain of the Employee benefit plans described in the Wage Motion, such as an Employee's share of medical, dental and vision benefits and insurance premiums, Employee contributions to retirement plans, contributions under flexible spending plans, Employee voluntary insurance premiums and miscellaneous deductions (collectively, the "Employee Deductions"). The Debtors then forward the amount of the Employee Deductions to the appropriate third party recipients. Due to the commencement of these chapter 11 cases, however, certain Employee Deductions that were deducted from Employees' earnings may not have been forwarded to the appropriate third-party recipients prior to the Petition Date. Accordingly, the Debtors request authority, but not direction, to forward any unpaid Employee Deductions to the appropriate third party recipients and to continue to forward these prepetition Employee Deductions to the applicable third party recipients on a postpetition basis, in the ordinary course of business as routinely done prior to the Petition Date.

72.     Further, the Debtors are required by law to withhold from an Employees' wages amounts related to federal, state and local income taxes, social security and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority (collectively, the "Withheld Amounts"). The Debtors must then pay social security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively, the "Employer Payroll Taxes"). Prior to the Petition Date, the Debtors withheld the appropriate amounts from the Employees' earnings for the Withheld Amounts and the Employee Payroll Taxes (collectively, the "Payroll Taxes"), but such funds may not have been forwarded to the appropriate taxing authorities. The Debtors request the authority, but not direction, to forward any outstanding Payroll Taxes to the appropriate third parties, and to

continue to honor and process the prepetition payments for Payroll Taxes on a postpetition basis, in the ordinary course of business, as routinely done prior to the Petition Date.

### (iv) Employee Benefits

73. The Debtors maintain various plans and policies to provide their active Employees with various benefits, including (i) medical, dental, and vision coverage through self-insured employee benefit plans and flexible spending accounts, (ii) vacation time and other paid leaves of absence, (iii) workers' compensation insurance, (iv) long term disability, life and accidental death and dismemberment insurance, and (v) retirement plans (collectively, the "Employee Benefits"). Neither the Temporary Employees nor the Independent Consultants receive any Employee Benefits from the Debtors. The Employee Benefits are described in greater detail in the Wage Motion.

74. The Employee Benefits represent an integral component of each Employee's compensation package, and without these benefits, the Debtors believe they would be unable to retain all of their personnel and would impose a severe hardship on the Employees and their families. The Debtors request the authority, but not the direction, to continue to honor the Employee Benefits in the ordinary course of business, and to honor and pay any prepetition amounts related thereto.

75. I have read the Wage Motion and I believe that the relief requested by the Wage Motion is in the best interest of the Debtors and their estates.

**K.      Motion of Debtors for an Order (I) Approving Continued Use of Existing Bank Accounts, Business Forms, and Cash Management System, (II) to Obtain Limited Waiver of the Requirements of 11 U.S.C. § 345(b), and (III) Granting Post-Petition Intercompany Claims Administrative Priority (the "Cash Management Motion")**

76. In the Cash Management Motion, the Debtors seek authority to maintain existing bank accounts, business forms and cash management system and to obtain a limited

waiver of the requirements of 11 U.S.C. § 345(b). In addition, the Debtors seek entry of an order

granting post-petition intercompany claims administrative priority.

### (i)    Maintenance of Existing Bank Accounts

77.    Prior to the Petition Date, the Debtors, in the ordinary course of their

business, maintained sixteen bank accounts, which are described more fully on Exhibit A to the

Cash Management Motion (collectively, the "Bank Accounts"). Prior to the Petition Date, the

Debtors' cash management system operated in the manner described in the Cash Management

Motion. The flow of each of the Debtors' funds through the Bank Accounts is illustrated in the

flow chart attached as Exhibit B to the Cash Management Motion and incorporated by reference

herein.

78.    I understand that the United States Trustee has established Operating

Guidelines for chapter 11 cases (the "Operating Guidelines") applicable to debtors in possession

that continue to operate their businesses after the commencement of their chapter 11 cases. One

provision of the Operating Guidelines requires a chapter 11 debtor in possession to open new

bank accounts and to close all existing accounts.

79.    The Debtors seek a waiver of the Operating Guideline's requirement that

the Bank Accounts be closed and new post-petition bank accounts be opened.

80.    If enforced in these chapter 11 cases, this requirement would cause undue

disruption to the Debtors' continued operations and would impair their efforts to maximize value

through this chapter 11 process. Dismantling the Debtors' cash management system would

likely disrupt the Debtors' relationships with their key stakeholders and would make it materially

more difficult and expensive to maintain operations pending their reorganization.

### (ii)    Continued Use of Existing Business Forms

81.    To minimize expense and inconvenience to their estates, the Debtors have

also requested authority to continue to use their existing supplies of correspondence and business forms (including, but not limited to, letterhead, purchase orders, invoices, and checks), without reference to their status as debtors in possession.

82.    The Debtors will, of course, ensure that the "Debtor In Possession" designation is placed on any new checks ordered after the Petition Date.

83.    The continued use of the Debtors' existing business forms and checks will avoid the expense and disruption that might otherwise result from ordering and instituting the use of new business forms during the initial days of these chapter 11 cases.

(iii)    **Continuation of the Existing Cash Management System**

84.    The Debtors maintain current and accurate accounting records of daily cash transactions and submit that maintenance of their current cash management system will prevent undue disruption to their businesses and operations, while protecting their existing cash assets for the benefit of their estates. The components of the Debtors' cash management system and the flow of funds among the various Bank Accounts are set forth in detail in the Cash Management Motion.

85.    If the Debtors are not permitted to continue to use their cash management system as described therein, it will impair the orderly operation of the Debtors' businesses.

(iv)    **Limited Waiver of 11 U.S.C. § 345(b)**

86.    The Debtors are requesting that the Court waive the requirements of section 345(b) on an interim basis and permit them to maintain their deposits in their accounts in accordance with their existing deposit practices until such time as the Debtors obtain this Court's approval to deviate from the guidelines imposed under section 345(b) of the Bankruptcy Code on a final basis.

87. During the extension period, the Debtors will either come into compliance with the requirements of section 345(b) of the Bankruptcy Code or move the Court for authority to deviate from such requirements. Given the complexity of the Debtors' Cash Management System and the relative security of the Cash Management System, the Debtors submit that cause exists to grant an interim sixty (60) day waiver of the requirements of section 345(b) of the Bankruptcy Code. The Debtors believe that the benefits of the requested extension far outweigh any harm to the estate.

### (v) Granting Post-Petition Intercompany Claims Administrative Expense Priority

88. From time to time, in the ordinary course of business, one of the Debtors may pay invoices or expenses which include amounts allocable to one or more other Debtors. The paying Debtor is, from time to time, reimbursed by the other Debtors for their portion of the expense (the "Intercompany Balances").

89. Prior to the Petition Date, the Debtors maintained accurate records of all Intercompany Balances. The Debtors will continue to maintain records related to the Intercompany Balances, so that transactions can be ascertained, traced and accounted for properly on applicable intercompany accounts.

90. To ensure that each individual Debtor will not, at the expense of creditors, fund the operations of an affiliated entity, the Debtors respectfully request that the Court, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, authorize the Debtors to treat all Intercompany Balances arising after the Petition Date in the ordinary course of business as administrative expenses. If the Court authorizes the Debtors to treat Intercompany Balances as administrative expenses, then each entity utilizing funds flowing through the Cash Management

System should continue to bear ultimate repayment responsibility for ordinary course transactions.

91.    I have read the Cash Management Motion and believe that the relief requested by the Cash Management Motion is in the best interests of the Debtors and their estates.

**L.        Motion of the Debtors for an Interim and Final Order Pursuant to 11 U.S.C. §§ 105 and 366 of the Bankruptcy Code (I) Finding Utilities Adequately Assured of Future Performance, (II) Enjoining Utilities from Altering, Refusing, Discontinuing, or Interfering with Utility Service, and (III) Establishing Procedures for Determining Requests for Additional Adequate Protection (the "Utilities Motion")**

92.    The Debtors seek entry of  an interim order (the "Interim Order") (i) prohibiting any utility companies (each a "Utility Company" and, collectively, the, "Utility Companies") that provide service to the Debtors from altering, refusing, or discontinuing services to, or discriminating against, the Debtors on account of pre-petition amounts due to them from the Debtors, pending entry of a final order (the "Final Order") granting the relief sought in the Utilities Motion; (ii) approving the adequate assurance deposit proposed therein; and (iii) approving a procedure for resolving any disputes regarding the appropriate amount of adequate assurance to be provided with respect to each utility provider.

93.    In the ordinary course of business, the Debtors regularly incur utility expenses for water, electricity, gas, local and long-distance telecom services, data services, waste disposal, and other similar services.  The Utility Companies, the particular services they provide and the average monthly cost for these services are set forth more fully in the Utilities Motion and incorporated by reference herein.

94.    The Debtors have a long and established payment history with most or all of the Utility Providers, indicating generally consistent payment for utility service.  As of the

Petition Date, however, the Debtors may have had (a) pre-Petition Date accounts payable to certain Utility Providers, (b) outstanding checks issued to certain Utility Providers in payment for pre-Petition Date charges for utility services that had not cleared the Debtors' bank account prior to the Petition Date, or (c) liabilities for pre-Petition Date utility services for which the Debtors had not yet been billed.

95.     Uninterrupted service from the Utility Companies is essential to the Debtors' continued operation and the possibility of a successful restructuring. The Debtors simply could not maintain their operations in the absence of continuous service. It is therefore critical that the Utility Companies be ordered to provide uninterrupted services to the Debtors, subject only to the Debtors' provision of adequate assurance as set forth in the Utilities Motion and incorporated by reference herein.

96.     I have read the Utilities Motion and believe that the relief requested by the Utilities Motion is in the best interests of the Debtors and their estates, and is necessary to protect the Debtors from the irreparable harm that would otherwise result from a loss of utility service.

**M.      Motion of Debtors for an Order Authorizing, But Not Directing, The Payment of Certain Prepetition Sales, Use, Franchise, Real Property and Income Taxes, Licensing Fees, and Similar Obligations (the "Tax Motion")**

97.     The Debtors have requested that: (a) they be authorized, but not directed, to pay, in the ordinary course of business, certain accrued and outstanding prepetition sales, use, franchise, real property and income taxes, and such other similar taxes as the Debtors deem necessary, as well as fees for licenses, and other similar charges and assessments (collectively, the "Taxes") owing to the Taxing Authorities (each as defined in the Tax Motion) as such payments become due; and (b) the Court direct the Debtors' banks to honor and process checks and electronic transfers related to such relief. The Taxing Authorities and the amounts owing to the Taxing Authorities is set forth in the Tax Motion and incorporated by reference herein.

98.     The Debtors believe that the payment of these claims is necessary and appropriate to avoid any unnecessary disruptions in the Debtors' postpetition operations due to audits, lien claims, or even civil suits against the Debtors' officers and directors that might otherwise result.

99.     I have read the Tax Motion and believe that the relief requested by the Tax Motion is in the best interests of the Debtors and their estates.

N.      **Motion of the Debtors for (I) an Order Authorizing Payment of Certain Prepetition Claims of Critical Vendors and (II) an Order Authorizing, But Not Directing, After Notice and a Hearing, the Debtors to Pay Certain Obligations Arising in Connection with Goods Received by the Debtors Within the Twenty Day Period Before the Petition Date (the "Critical Vendor Motion")**

100.    The Debtors have requested the entry of an order (i) authorizing, on an emergency basis, the Debtors to pay, in their discretion, certain prepetition claims of critical vendors (the "Critical Vendors") and (ii) authorizing, but not directing, after notice and a hearing, the Debtors, in their discretion, to pay certain obligations arising under section 503(b)(9) of the Bankruptcy Code in connection with goods supplied by vendors that were received by the Debtors in the ordinary course of their businesses within the twenty day period before the Petition Date.

101.    The Critical Vendor Motion further seeks authorization for all applicable banks and other financial institutions asked to process, honor and pay any and all checks and transfer requests with respect to Critical Vendor Claims and Twenty Day Claims (each as defined in the Critical Vendor Motion) to rely on the representations of the Debtors as to which checks are issued or authorized to be paid in accordance with this Motion without any further duty of inquiry and without liability for following the Debtors' instructions.

102.    The Debtors believe that payment of the Critical Vendor Claims is vital to

the Debtors' reorganization efforts because the Critical Vendors are the only source from which the Debtors can procure certain goods and services within a timeframe and at a price that will permit the Debtors to continue their businesses. A failure to pay the Critical Vendor Claims would likely result in many of the Critical Vendors refusing to provide goods and services to the Debtors postpetition, and may force the Debtors to obtain such goods and services elsewhere at a higher price or not of the quantity or quality required by the Debtors.

103.    Accordingly, I believe it is in the best interests of the Debtors and their estates that the court enter an order authorizing the Debtors, in their discretion, to pay certain prepetition claims of Critical Vendors, subject to the procedures as set forth in the Critical Vendor Motion and incorporated by reference herein.

**O.      Motion of Debtors for Entry of an Order Authorizing, But Not Requiring, Debtors to Honor Certain Pre-Petition Obligations to Customers and to Otherwise Continue Customer Warranty Program and Practices in the Ordinary Course of Business (the "Customer Programs Motion").**

104.    In the Customer Programs Motion, the Debtors seek entry of an order authorizing, but not requiring the Debtors to: (i) perform and honor their pre-petition obligations to customers related to the Debtors' customer warranty program (the "Customer Warranty Program"); (ii) continue, renew, replace, implement new and/or terminate such aspects of the Customer Warranty Program as they see fit, in the ordinary course of business, without further application to the Court; and (iii) honor and perform certain pre-petition obligations necessary to maintain the existence of the Customer Warranty Program.

105.    In the ordinary course of conducting their businesses, the Debtors provide standard warranties on all products they manufacture and sell, such as lasers, scanners, printed circuit board spindles, encoders, printers and semiconductor systems. The duration of the warranty period varies depending on the product, but is generally between twelve and twenty-

four months. Within some product lines, customers are allowed to purchase an extended warranty on certain products. The Debtors also provide warranties on the parts they sell to their customers that typically extend for ninety days. In addition, resellers that purchase the Debtors' products have policies which allow customers to return products that may be defective, and which are covered by the Debtors under the Customer Warranty Program. The Debtors provide the warranty-related service directly, and not through a third-party service provider. The Customer Warranty Program is described more fully in the Customer Programs Motion and incorporated by reference herein.

106.    Programs like the Customer Warranty Program are customary within the Debtors' industry. If the Debtors are not allowed to continue their Customer Warranty Program and honor the amounts owing under such program, the Debtors will not stand on equal footing with their competitors. In addition, any delay in honoring the Debtors' Customer Warranty Program obligations thereunder may irreparably impair customer relations and undermine loyalty to the Debtors' products, which is critical for the Debtor's ongoing operations and reorganization efforts.

107.    Accordingly, I believe that the relief requested by the Customer Programs Motion is in the best interests of the Debtors and their estates.

**P.      Motion of Debtors for Entry of Order Pursuant to 11 U.S.C. § 105(a) Enforcing Protections of 11 U.S.C. §§ 362, 365(e)(1), and 525 (the "Enforcement Motion")**

108.    To aid in the administration of the Debtors' bankruptcy cases and to provide the Debtors with breathing space to focus on maximizing value for their stakeholders, the Debtors are requesting an order that confirms the application of three key protections afforded to the Debtors under the Bankruptcy Code: (a) the automatic stay provisions of section

362 of the Bankruptcy Code; (b) the anti-termination and anti-modification provisions of section 365 of the Bankruptcy Code; and (c) the anti-discrimination provisions of section 525 of the Bankruptcy Code. The Debtors believe that the extensive and global nature of the Debtors' businesses and their wide-ranging dealings with non-U.S. creditors and other parties who are unfamiliar with the protections afforded chapter 11 debtors under sections 362, 365 and 525 of the Bankruptcy Code require that an order implementing these protections be entered by this Court.

109.     I have read the Enforcement Motion and believe that the relief requested by the Enforcement Motion is in the best interests of the Debtors and their estates.

**Q.      Motion of Debtors for an Order Confirming the Administrative Expense Priority of the Debtors' Undisputed and Liquidated Obligations for Postpetition Deliveries of Requested Goods (the "Administrative Expense Confirmation Motion")**

110.     Pursuant to sections 105, 363(c) and 503(b)(1)(A) of the Bankruptcy Code, and for purpose of obtaining and ensuring timely delivery from their vendors, suppliers and service providers of materials, supplies, goods, products and related items (collectively, the "Goods"), the Debtors hereby seek the entry of an order: (a) confirming the administrative expense priority status of the Debtors' undisputed and liquidated obligations to (i) suppliers for the postpetition delivery of requested Goods and (ii) service providers for the postpetition provision of services; (b) confirming that the Debtors have authority to pay such expenses in the ordinary course of their business; and (c) granting certain related relief.

111.     The Debtors believe that, as a result of the Debtors' filing of the chapter 11 cases, many Suppliers, particularly foreign suppliers or unsophisticated suppliers, may perceive a risk that they will not be paid or may be treated as prepetition general unsecured creditors for the cost of any shipments made after the Petition Date. As a result, the Suppliers

may refuse to ship Goods or provide services to the Debtors, to the detriment of the Debtors' efforts to preserve and maximize the value of their assets.

112.    Under these circumstances, the Debtors believe that relief is needed to permit the Debtors to obtain the delivery of Goods and provision of services from the Suppliers. Accordingly, the Debtors seek entry of an order confirming that the Debtors' undisputed and liquidated obligations to the Suppliers for (a) shipment of Goods requested by, delivered to and accepted by the Debtors on and after the Petition Date and (b) the provision of services to the Debtors on and after the Petition Date at the Debtors' request, each will be entitled to administrative expense priority status.    The Debtors submit that the relief sought herein is noncontroversial and entirely consistent with the applicable provisions of the Bankruptcy Code – the requested relief merely confirms the treatment of such postpetition obligations under the Bankruptcy Code.

113.    I have read the Administrative Expense Confirmation Motion and believe that the relief requested therein is in the best interests of the Debtors and their estates.

## PART III: CONCLUSION

Accordingly, for the reasons stated herein and in each of the First Day Pleadings, the relief sought therein is in the best interests of the Debtors, their creditors and estates; and therefore, on behalf of the Debtors, I respectfully request that the First Day Pleadings be granted.

I declare under penalty of perjury that, to the best of my knowledge, and after reasonable inquiry, the foregoing is true and correct.

Dated: November 20, 2009

Respectfully submitted,

GSI GROUP INC., on behalf of itself and its affiliated Debtors and Debtors-in-Possession

S. Edelstein

Name: Sergio Edelstein
Title:   President and Chief Executive Officer