# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>MES INTERNATIONAL, INC.,[1]<br><br>     Debtor. | Chapter 11<br><br>Case No. 09-14109 |
| In re:<br><br>GSI GROUP INC.,<br><br>     Debtor. | Chapter 11<br><br>Case No. 09-14110 |
| In re:<br><br>GSI GROUP CORPORATION,<br><br>     Debtor. | Chapter 11<br><br>Case No. 09-14111<br><br>Joint Administration Requested |

## APPLICATION OF DEBTORS FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF SAUL EWING LLP AS CO-COUNSEL TO THE DEBTORS PURSUANT TO 11 U.S.C. § 327(a) *NUNC PRO TUNC* TO THE PETITION DATE

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby submit this Application (the "Application") for entry of an order authorizing the employment and retention of Saul Ewing LLP ("Saul Ewing") as general reorganization and bankruptcy co-counsel for the Debtors pursuant to sections 327(a) and 1107(a) of the United States Code, 11 U.S.C. § 101, *et seq.*, as amended (the "Bankruptcy Code"), Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 2014-1 of the Local

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: MES International, Inc. (1964); GSI Group Inc. (0412); and GSI Group Corporation (9358). The Debtors' headquarters is located at 125 Middlesex Turnpike, Bedford, MA 01730.

Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), *nunc pro tunc* to the Petition Date. In support of this Application, the Debtors have relied on the Affidavit of Mark Minuti (the "Minuti Affidavit"), a copy of which is attached hereto as **Exhibit "A"**. In further support of the relief sought in the Application, the Debtors respectfully represent as follows:

## Jurisdiction and Venue

1. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory bases for the relief requested herein are sections 327(a) and 1107 of the Bankruptcy Code.

## Background

**A. Company Overview**

3. On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief with the Court under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases (the "Chapter 11 Cases") and, as of the date of the filing of this Motion, no official committees have been appointed or designated. Concurrently with the filing of this Motion, the Debtors have sought procedural consolidation and joint administration of the Chapter 11 Cases.

4. As more particularly described in the Edelstein Declaration, the Debtors in these cases are comprised of three entities within a corporate family led by parent company GSI Group

Inc. ("Holdings"). The Debtors consist of Holdings, its wholly owned subsidiary GSI Group Corporation ("GSI"), and MES International, Inc. ("MES"), itself an indirect wholly owned subsidiary of GSI. Holdings has ten other U.S. and nineteen foreign subsidiaries and one joint venture which have not filed for chapter 11 protection and are not debtors in the Chapter 11 Cases.

5. Holdings, together with its debtor and non-debtor subsidiaries (collectively, the "Company") designs, develops, manufactures and sells photonics-based solutions (consisting of lasers, laser systems and electro-optical components), precision motion devices, associated precision motion control technology and systems. The Company's customers incorporate its technology into their products or manufacturing processes for a wide range of applications across multiple markets, including: industrial, scientific, electronics, semiconductor, medical and aerospace. The Company's products enable customers to implement advanced manufacturing processes, to make advances in materials and processing technology, and to meet extremely precise manufacturing specifications, including device complexity and miniaturization.

6. The Company, headquartered in Bedford, Massachusetts, sells worldwide with a direct sales force and through distributors and sales agents. The Company has manufacturing, research and development sites in several states in North America, as well as in the United Kingdom, China and Germany. Additional sales, service and applications sites are located in multiple locations throughout Asia and around the world. The Company employs approximately 1,300 full and part-time employees.

7. In August 2008, the Company acquired Excel Technology, Inc. ("Excel"), a designer, manufacturer and marketer of photonics-based solutions. Prior to the acquisition, Excel, which is not a debtor in the Chapter 11 Cases, was headquartered in East Setauket, New

York. Excel manufactures its products in plants located in the United States and Germany, and sells its products to customers worldwide, both directly and indirectly through resellers and distributors.

**B.     Prepetition Financing**

8.     The Debtors have no material secured debt. In August 2008, in order to finance a portion of the Excel acquisition, GSI issued and sold to various investors $210.0 million of unsecured senior notes at a fixed interest rate of 11% per annum due 2013 (the "Senior Notes"), which are guaranteed by Holdings and certain of Holdings' U.S. subsidiaries.

**C.     Events Leading to the Commencement of the Chapter 11 Cases**

9.     As detailed in the Edelstein Declaration, delays in the integration of the financial accounting systems of Holdings and Excel immediately following the acquisition of Excel in 2008 initially led to a delay of several weeks in the preparation of Holdings' Quarterly Report on Form 10-Q for the quarterly period ended September 26, 2008 (the "2008 Q3 Report"). Shortly thereafter and prior to filing the 2008 Q3 Report, on December 4, 2008, Holdings announced that it had identified potential errors in the recognition of revenue related to sales to a customer in the first and second fiscal quarters of 2008 in Holdings' Semiconductor Systems Segment, which were brought to the attention of the Audit Committee of Holdings' Board of Directors (the "Audit Committee") by Holdings' management. Following an initial review, the Audit Committee, in consultation with Holdings' outside legal counsel and its independent auditors, Ernst & Young, determined that it was appropriate to undertake an independent review of the potential revenue recognition issues brought to its attention. In connection therewith, the Audit Committee subsequently voluntarily expanded its review of sales transactions in the Company's Semiconductor Systems Segment, along with other sales transactions that contained

arrangements with multiple deliverables for fiscal years 2006, 2007 and 2008. Between December 4, 2008 and March 30, 2009, Holdings announced that it had identified errors relating to the timing of revenue recognition relating to certain sales to customers in the Semiconductor Systems Segment during fiscal years 2006, 2007 and 2008 and that, as a result, the previously issued interim and annual financial statements for these years should not be relied upon.

10. In December of 2008, certain holders of the Senior Notes alleged that Holdings had failed to comply with the covenant in Section 4.02 of the indenture for the Senior Notes (the "Indenture") as a result of Holdings' failure to timely file its 2008 Q3 Report with the U.S. Securities and Exchange Commission. These holders further alleged that, if such failure continued for 60 days from the date that Holdings received notices of failure from Holders comprising at least 25% of the aggregate amount of Senior Notes then outstanding, then such failure would constitute an event of default.

11. As a result of these events, Holdings began engaging in ongoing discussions with certain holders of the Senior Notes. On February 11, 2009, Holdings announced that it entered into a forbearance agreement with certain entities holding greater than 75% of the outstanding aggregate principal amount of the Senior Notes (the "Senior Noteholders"). Thereafter, the Company continued to engage in negotiations that ultimately led in June 2009 to an agreement on a non-binding term sheet with the Senior Noteholders to consensually restructure the Company's outstanding obligations under the Senior Notes. Since that time, Holdings has conducted an extensive process to identify possible alternatives to the transactions described in the Plan (as hereinafter defined), and has concluded that the transactions described in the Plan provide the highest and best treatment for all creditors of the Debtors' estates, Holdings' shareholders and the Company's customers, vendors and employees.

12. On November 19, 2009, the Debtors and the Senior Noteholders entered into a Plan Support Agreement. Pursuant to the Plan Support Agreement, holders of 88.1% of the outstanding principal amount of the Senior Notes have agreed to support the Joint Chapter 11 Plan of Reorganization for MES International, Inc., GSI Group Inc. and GSI Group Corporation (the "Plan") which was filed in the Chapter 11 Cases on the Petition Date, to the extent the Debtors continue to comply with the terms and conditions of the Plan Support Agreement. Pursuant to the Plan, the Senior Notes, together with an additional unsecured note payable by GSI to a foreign subsidiary of Holdings (the "GSI UK Note"), will be converted to (a) a payment in cash for certain accrued and unpaid interest (at the non-default rate), fees, expenses (including, without limitation, all amounts payable to the trustee under the Indenture) and all other amounts (other than principal) due to the extent such amounts are unpaid as of the Effective Date; (b) new common shares equal to 81.4% of the outstanding capital stock of reorganized Holdings[2]; and (c) new secured notes in the approximate amount of $104,100,000[3], resulting in the reduction of the Debtors' funded indebtedness by more than $125,000,000 and leaving the Debtors' remaining debt, including all vendor payables and all or substantially all other claims, unimpaired under the Plan. The Debtors filed the Chapter 11 Cases to implement the Plan.

13. The Debtors have met their obligations as they have come due. The Debtors have had sufficient cash from operations to meet their obligations arising prior to their filing of the Plan and believe that they will continue to have sufficient cash to readily pay when due all ordinary course obligations arising after the commencement of the Chapter 11 Cases.

---

[2] Specifically, the holders of Senior Notes will receive approximately 74.3% of the outstanding capital stock of reorganized Holdings, and the holder of the GSI UK Note will receive approximately 7.1% of the outstanding capital stock of reorganized Holdings.

[3] Specifically, holders of the Senior Notes will receive new secured notes in the approximate aggregate amount of $95 million, and the holder of the GSI UK Note will receive new secured notes in the approximate aggregate amount of $9.1 million.

14. The Debtors are making every effort to commence and implement these cases with as little disruption as possible to their highly valued customers, employees and vendors. Additional information regarding the Debtors and the Company, and the background to the Debtors' bankruptcy filing, is set forth in the Edelstein Declaration filed contemporaneously herewith and incorporated by reference herein.

### Relief Requested

15. By this Application, the Debtors seek authority to employ and retain Saul Ewing LLP ("Saul Ewing" or the "Firm") as their bankruptcy co-counsel with respect to the filing and prosecution of their chapter 11 cases. For the reasons set forth below, the Debtors desire to retain Saul Ewing as section 327(a) co-counsel *nunc pro tunc* to the Petition Date.

### Saul Ewing's Qualifications

16. The Debtors seek to retain Saul Ewing as their co-counsel because of the Firm's extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code. The Debtors believe that Saul Ewing is well-qualified and able to represent them in these chapter 11 cases in an efficient and timely manner.

17. The Debtors have also filed an application to retain the law firm of Brown Rudnick LLP ("Brown Rudnick") to act as their primary bankruptcy counsel in these chapter 11 cases. Brown Rudnick does not maintain an office in the State of Delaware, and the Debtors are required to retain Delaware counsel. Saul Ewing's and Brown Rudnick's lawyers have conferred about their respective roles in these cases in order to avoid duplication of effort.

## Services To Be Provided

18.     The Debtors contemplate that the legal services to be rendered by Saul Ewing may include, but shall not be limited to, the following:

- a. advising the Debtors of their rights, powers and duties as debtors in possession;

- b. advising the Debtors regarding matters of bankruptcy law;

- c. representing the Debtors in proceedings and hearings in the United States Bankruptcy Court for the District of Delaware;

- d. representing the Debtors, and acting as primary counsel, in any matter in which Brown Rudnick has a conflict;

- e. preparing on behalf of the Debtors any necessary motions, applications, orders, responses, and other legal papers;

- f. providing assistance, advice, and representation concerning the confirmation of any proposed plan(s) and solicitation of any acceptances or responding to objections to such plan(s);

- g. advising the Debtors concerning, and assisting in the negotiation and documentation of, financing agreements, debt restructurings, cash collateral arrangements, and related transactions;

- h. providing assistance, advice, and representation concerning any possible sale of the Debtors' assets;

- i. reviewing the nature and validity of liens asserted against the property of the Debtors and advising the Debtors concerning the enforceability of such liens;

- j. providing assistance, advice and representation concerning any further investigation of the assets, liabilities, and financial condition of the Debtors that may be required under local, state, or federal law;

- k. prosecuting and defending litigation matters and such other matters that might arise during the Chapter 11 Cases;

- l. providing counseling and representation with respect to assumption or rejection of executory contracts and leases, sales of assets, and other bankruptcy-related matters arising from these cases;

m. rendering advice with respect to general corporate and litigation issues relating to these cases, including, but not limited to, securities, corporate finance, tax, and commercial matters; and

n. performing such other legal services as may be necessary and appropriate for the efficient and economical administration of the Chapter 11 Cases.

As noted above, Saul Ewing will work with Brown Rudnick to avoid duplication of effort in providing services to the Debtors.

**Payment of Fees and Expenses**

19. Subject to Court approval in accordance with Bankruptcy Code §§ 330(a) and 331, compensation will be payable to Saul Ewing on an hourly basis, plus reimbursement of actual, necessary expenses incurred by the Firm. The attorneys presently designated to represent the Debtors and their current standard hourly rates are:

| Name | Title | Hourly Rate |
| --- | --- | --- |
| Mark Minuti | Partner | $560 |
| MaryJo Bellew | Associate | $390 |
| Lucian B. Murley | Associate | $275 |
| Melissa W. Rand | Associate | $235 |
| Sean C. Sansiveri | Associate | $235 |

20. In addition, other attorneys and paralegals will be involved as necessary and appropriate to represent the Debtors, and Saul Ewing's hourly rate for other attorneys and professionals are as follows:

| Billing Category | Range |
| --- | --- |
| Partners | $335 – 655 |
| Special Counsel | $275 – 535 |
| Associates | $215 – 390 |
| Paraprofessionals | $105 – 240 |

21. These hourly rates are subject to periodic adjustments (typically in January or July of each year) to reflect economic and other conditions. Saul Ewing will maintain detailed records of actual and necessary costs and expenses incurred in connection with the legal services

described above. These rates are set at a level designed to fairly compensate the Firm for the work of its attorneys and paralegals and to cover fixed and routine overhead expenses. It is Saul Ewing's policy to charge its clients for all other expenses incurred in connection with the client's case. The expenses charged to clients include, among other things, telephone and telecopier toll and other charges, mail and express mail charges, special or hand delivery charges, photocopying charges at the rate of $0.10 per page, travel expenses, expenses for "working meals", computerized research, transcription costs, as well as non-ordinary overhead expenses such as secretarial and other overtime. The Firm will charge the Debtors for these expenses in a manner and at rates consistent with charges made generally to the Firm's other clients, subject to the Local Rules of this Court.

22. Saul Ewing was retained by the Debtors in connection with the preparation and filing of these chapter 11 cases. Prior to the Petition Date, Saul Ewing received retainers from the Debtors totaling $250,000 for the planning, preparation of documents and its proposed post-petition representation of the Debtors, and for the petition filing fees (in the amount of $3,117). Of the retainer amount, $174,651.73 was applied to pay pre-petition fees and expenses incidental to the preparation and filing of these cases, and $3,117 in designated filing fees was used to pay the actual filing fees. The remaining $75,348.27 constitutes an advance security retainer to be applied against Saul Ewing's allowed fees and expenses, as permitted by the Court (the "<u>Postpetition Retainer</u>"). According to the terms of Saul Ewing's engagement, the Postpetition Retainer will be treated as an "evergreen retainer," to be applied at the completion of Saul Ewing's engagement.

23. A statement of the compensation received by Saul Ewing for services rendered to the Debtors in the one year preceding the Petition Date, and the source of such compensation, is set forth in the Minuti Affidavit.

### Saul Ewing's Disclosures Regarding Retention by the Debtors

24. The standard for a debtor-in-possession to employ attorneys as general bankruptcy counsel is set forth in sections 327(a) and 1107 of the Bankruptcy Code, as interpreted by the Third Circuit. Those sections provide that a debtor-in-possession, with the Court's approval, may employ attorneys "that do not hold or represent an interest adverse to the estate," and that are "disinterested persons." 11 U.S.C. § 327(a); 11 U.S.C. § 1107; see also In re BH&P, Inc., 949 F.2d 1300, 1314 (3d Cir. 1991) (citing In re Star Broadcasting, Inc., 81 B.R. 835, 838 (Bankr. D.N.J. 1988) (for counsel to be retained, "counsel must 'not hold or represent an interest adverse to the estate' and must be a 'disinterested person'")). A "disinterested person" is defined as one who does not have an interest materially adverse to the interest of the estate, by reason of any direct or indirect relationship with the debtor, or for any other reason. 11 U.S.C. § 101(14)(e). In general, however, subject to the requirements of sections 327(a) and 1107, a debtor-in-possession is entitled to the counsel of their choosing. See, e.g., In re Vouzianas, 259 F.3d 103, 108 (2d Cir. 2001) (observing that "[o]nly in the rarest cases should the trustee be deprived of the privilege of selecting his own counsel").

25. As described in detail in the attached Minuti Affidavit, Saul Ewing has conducted an extensive search of its conflict database with respect to the Debtors and a voluminous list of parties in interest and potential parties in interest in the Chapter 11 Cases. The scope of that conflicts search is set out on Exhibit 1 to the Minuti Affidavit and the results of the conflicts search are set forth on Exhibit 2 to the Minuti Affidavit. Based on the results of that conflicts

search, Saul Ewing has informed the Debtors that, as set forth in more detail in the concurrently filed Minuti Affidavit and subject to any explanations and/or exceptions set forth therein, Saul Ewing (a) does not hold or represent any interest adverse to the Debtors' estates, and (b) is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code.

26. Saul Ewing has informed the Debtors that it will conduct an ongoing review of its files to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new material facts or relationships are discovered or arise, Saul Ewing will supplement its disclosure to the Court.

### Notice

27. Notice of this Motion has been given to: (i) the Office of the United States Trustee; (ii) those creditors listed on the Debtors' Consolidated List of Creditors Holding the 30 Largest Unsecured Claims; (iii) the Office of the United States Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v) the U.S. Securities and Exchange Commission; (vi) counsel to the Senior Noteholders; and (vii) the Indenture Trustee on behalf of the holders of the Senior Notes and its counsel.

### No Prior Request

28. No prior motion for the relief requested herein has been made to this or any other court.

**WHEREFORE**, based on the facts and disclosures above, the Debtors respectfully request that the Court enter an Order, substantially in the form submitted herewith, (i) granting the Application and authorizing the Debtors to employ Saul Ewing as their bankruptcy co-counsel pursuant to section 327(a) of the Bankruptcy Code, *nunc pro tunc* to the Petition Date, on the terms and conditions set forth in this Application; and (ii) granting such other and further relief as may be just and proper.

Dated: November 20, 2009

Respectfully submitted,

GSI GROUP INC., on behalf of itself and its affiliated Debtors and Debtors-in-Possession

*S. Edelstein*
Name: Sergio Edelstein
Title: President and Chief Executive Officer